IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RAY W. SCOTT and CATHIE M. SCOTT,

Plaintiffs,

v.

SEARS, ROEBUCK AND CO., a foreign business corporation,

Defendant.

CV. 04-1186-AS

OPINION AND ORDER

ASHMANSKAS, Magistrate Judge:

Plaintiff Ray Scott ("Scott") alleges that his employer, defendant Sears, Roebuck and Co. ("Defendant"), discriminated against him because of his age in violation of the federal Age Discrimination in Employment Act of 1967 (29 U.S.C. §§621-634 *et seq.*)(the "ADEA"), as well as the comparable state statute, and ultimately terminated him for complaining about such discrimination and applying for workers' compensation benefits. He also alleges claims for common-law wrongful discharge and intentional infliction of emotional distress. Scott's wife, Cathie, asserts a claim for loss of consortium. Defendant moves for summary judgment on all

claims.

## Background

Scott was hired by Defendant in 1973 as an automotive technician in its Automotive Center in Salem, Oregon. Over the next few years, Scott attended training classes, became a Tech III, and was qualified to perform all of the duties of a Tech III, which included front and rear brake repair and alignments. Defendant's automotive technicians were paid a base rate and received additional compensation for work performed, with Tech III work generating more compensation than Tech I or Tech II work.

In the summer of 2002, Defendant moved its Salem Automotive Center to a new location. Defendant anticipated that the new location would significantly increase automotive service sales. Concurrent with the move, Defendant adopted new policies and procedures, with greater emphasis on employees meeting production standards. For automotive employees, one of these productivity standards was "Sales Per Hour" ("SPH"). Duley Aff. at 2.

Damian Desmond[1] became the manager of the Salem Automotive Center in September 2002 and became Scott's manager. Over the next year, Desmond criticized Scott's performance and ability to communicate appropriately with others, disciplined Scott for various issues, assigned him menial tasks generating less compensation and, eventually, recommended Scott's termination. Scott alleges that Desmond's actions were based on Plaintiff's age and Desmond's desire to terminate older employees.

/ / / / /

## Workers' Compensation Claim and Hearing

[1]Desmond was less than 30 years old at this time.

On September 24, 2003, Scott asked Desmond for the form required to initiate a workers' compensation claim. When asked if he had been physically injured in the shop, Scott replied in the negative. Desmond then asked why Scott needed a claim form and Scott refused to answer. Desmond made an appointment for Scott to meet with Susan Duley, the store manager. Andy Antonson, of Defendant's loss prevention department, was also present for the meeting. Duley asked Scott how he had been injured. Scott stated that he felt he had been "damaged" since he was let go in December 2002.[2] Scott was given the form and the meeting ended. Both Desmond and Duley explained to Scott that they needed to know if and how he got hurt to prevent similar injuries to other employees.

On October 1, 2003, Scott filed a workers' compensation claim ("Claim") against Defendant alleging that he was suffering from a mental disorder caused by the ongoing harassment by Desmond. Scott was terminated on October 13, 2003.

The Claim was denied by Defendant's insurer. A three-day hearing was then held before John Howell, Administrative Law Judge for Oregon's Workers' Compensation Board ("ALJ"). Scott was represented at the hearing by legal counsel. No less than five witnesses testified and documentary evidence was presented.

The primary issue before the ALJ was whether Scott's mental disorder was compensable under Oregon's workers' compensation statutes. Under the statutes, "the worker must prove that employment conditions were the major contributing cause of the disease." O.R.S. 656.802(2)(a). If the claim is based on a a mental disorder, the claimant must establish that:

---

[2]Scott was laid off during a company downsizing in December 2002 but was rehired again after two weeks.

(a) The employment conditions producing the mental disorder exist in a real and objective sense.

(b) The employment conditions producing the mental disorder are conditions other than conditions generally inherent in every working situation or reasonable disciplinary, corrective or job performance evaluation actions by the employer, or cessation of employment or employment decisions attendant upon ordinary business or financial cycles.

(c) There is a diagnosis of a mental or emotional disorder which is generally recognized in the medical or psychological community.

(d) There is clear and convincing evidence that the mental disorder arose out of and in the course of employment.

O.R.S. 656.802(3).

On October 25, 2004, the ALJ found that Scott suffered from a diagnosed recognizable mental disorder and that the mental disorder arose from stress associated with his employment. However, the ALJ denied the Claim based on his finding that the employment conditions primarily responsible for Scott's mental disorder were reasonable disciplinary, corrective or job performance actions by the employer. Specifically, the ALJ evaluated the evidence as follows:

> The event that claimant points to as first contributing to his mental disorder, and the event which convinced him that much of what when on thereafter was harassment aimed at getting rid of him, was the disciplinary action taken against him in October 2002.
>
> This record establishes that claimant and his assistant manager knowingly violated an employment policy prohibiting an employee from working on his own vehicle. Claimant admitted as much to his wife. Sears disciplined claimant and the assistant manager equally. The discipline was less than the maximum provided for in such a situation. Investigation of the incident and the determination of the appropriate discipline were made by Sears personnel other than Desmond.
>
> I conclude that claimant has failed to establish that the discipline he received in October 2002 was unreasonable. The contribution to the cause of claimant's mental disorder by that disciplinary action may not be considered as contributory for purposes of this claim.

The evidentiary record in this case establishes that claimant had some recurring problems with communications and interpersonal relations. Those problems were not limited to interactions between claimant and Desmond. Claimant had similar problems with two previous supervisors, with the District Manager, with coworkers and with customers.

As a result of claimant's problem interacting with others, he was "coached" and then given a PPI [Performance Plan for Improvement]. Claimant asserts that he was given a PPI in December 2002 to allow Sears to lay him off later that month. Although claimant appears quite convinced of that, he has little more than his own belief to establish that the PPI was anything other than a reasonable corrective action.

I conclude that the coaching and the PPI given to claimant through December 2002 were given to correct a real and recurrent deficiency in claimant's interactions with customers and other Sears employees. Claimant has failed to prove that the coaching or the PPI were not reasonable corrective actions. Therefore, to the extent that they contributed to his mental disorder, claimant's receipt of coaching concerning interpersonal skills and the December 2002 PPI may not be considered as employment-related causes. O.R.S. 656.802(3)(b).

The only evidence in this record is that the layoffs made by Sears at its Salem Auto Center in December 2002, including claimant's, were made based upon ordinary business or financial cycles. That is, reduced sales and service in the winter and unrealized increases anticipated from the move to a new location, left Sears overstaffed in certain positions.

The selection of claimant as the Tech III to be laid off was made pursuant to an established lay-off procedure. Claimant does not assert otherwise.

I conclude that the causal contribution to claimant's mental disorder resulting from his layoff may not be considered in determining the compensability of his claimed mental disorder. O.R.S. 656.802(3)(b).

Claimant alleges additional employment-related contributions to his mental disorder in 2003, including specific incidents and a pattern of discrimination through assignment of lesser paying jobs. The latter assertion is not supported by claimant's claim that he suffered at least $100 a week reduction in income, nor by the fact that he performed lower paying battery jobs three to five times a day.

In any case, it is unnecessary to further examine the nature of claimant's various stressors. When his October 2002 final written warning, his December 2002 PPI and his December 2002 layoff are removed from consideration, it is clear that the evidence, medical and otherwise, does not support the conclusion that other stressors which might be considered constituted the major contributing cause of his

> mental disorder. Claimant has failed to prove that his claimed mental disorder is an occupation disease.

Lee Aff., Exh. B. Scott requested a review of the ALJ's decision by the Workers' Compensation Board. That review is still pending.

Preliminary Procedural Matter

Defendant moves to strike designated portions of the affidavits of Ray Scott and Mario Tavera and numerous exhibits attached to the affidavit of Michael Callahan. With regard to Ray Scott and one sentence of Mario Tavera, Defendant argues that the objectionable portions seek to relitigate facts adjudicated in the workers' compensation hearing. Based on the court's ruling on issue preclusion discussed below, Defendant's motion to strike is granted to the extent the designated portions deal with conduct prior to January 2003. The remaining objectionable material has been considered by the court but the weight given to such evidence has been modified where appropriate to address Defendant's concerns.

Legal Standard

Rule 56 of the Federal Rules of Civil Procedure allows the granting of summary judgment:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c). "[T]he requirement is that there be no genuine issue of material fact." Anthes v. Transworld Systems, Inc., 765 F. Supp. 162, 165 (Del. 1991)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986))(emphasis in original).

The movant has the initial burden of establishing that no genuine issue of material fact exists or that a material fact essential to the nonmovant's claim is absent. Celotex v. Catrett, 477 U.S. 317, 322-24 (1986). Once the movant has met its burden, the onus is on the nonmovant to establish that

there is a genuine issue of material fact. Id. at 324. In order to meet this burden, the nonmovant "may not rest upon the mere allegations or denials of [its] pleadings," but must instead "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Celotex, 477 U.S. at 324.

An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome of the case. Anderson, 477 U.S. at 248. Factual disputes are genuine if they "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. On the other hand, if after the court has drawn all reasonable inferences in favor of the nonmoving party, "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted).

## Discussion

**Issue Preclusion**

Defendant asserts that Ray and Cathie Scott (collectively "Plaintiffs") are precluded from relitigating issues that were determined in favor of Defendant during the workers' compensation hearing. Issue preclusion arises when an issue of ultimate fact has been determined in a prior proceeding. Nelson v. Emerald People's Utility Dist., 318 Or. 99, 102-103 (1994). The parties agree that this case is governed by Fisher Broadcasting, Inc. v. Dep't of Revenue, 321 Or. 341 (1995). In Fisher, the court adopted the five-part test initially set forth in Nelson, which provides that:

> If one tribunal has decided an issue, the decision on that issue may preclude relitigation of the issue in another proceeding if five requirements are met:
>
> 1. The issue in the two proceedings is identical.
>
> 2. The issue was actually litigated and was essential to a final decision on the merits in the prior proceeding.

3. The party sought to be precluded has had a full and fair opportunity to be heard on that issue.

4. The party sought to be precluded was a party or was in privity with a party to the prior proceeding.

5. The prior proceeding was the type of proceeding to which this court will give preclusive effect.

Nelson, supra, at 104 (cites omitted). Plaintiffs concede that they were either a party, or in privity with a party, to the prior proceeding. Plaintiffs dispute the remaining four elements of the test.

-The issue in the two proceedings is identical.

Plaintiffs argue that the issues raised and addressed in the workers' compensation hearing are not identical to those presently before this court. Plaintiffs also contend that the difference in the standard of proof (clear and convincing evidence in a workers' compensation proceeding v. preponderance of evidence in a civil action) prevents the application of issue preclusion in this instance.

The primary issue before the ALJ was whether Scott's mental disorder was compensable under Oregon's workers' compensation statutes. To establish the compensability of his mental disorder, Scott had to prove that "the employment conditions producing the mental disorder are conditions other than conditions generally inherent in every working situation or reasonable disciplinary, corrective or job performance evaluation actions by the employer, or cessation of employment or employment decisions attendant upon ordinary business or financial cycles." The ALJ determined that Scott's condition was not compensable because the primary causes of the condition were reasonable disciplinary or corrective actions or were subject to established lay-off procedures. In other words, the ALJ determined that Defendant's actions were based on valid business practices.

Defendant's motive for its treatment of Scott after October 2002 is at issue in a number of claims presently before the court. Plaintiffs contend that Defendant's behavior was motivated by its desire to discriminate against Scott based on his age. Defendant asserts that its behavior was intended to correct or discipline Scott for his misconduct, behavioral issues and substandard job performance. The ALJ's decision, while not wholly determinative of any claim, is relevant to the question of Defendant's motives for its behavior. With regard to the claims in which Defendant's motives are relevant, the court finds that the issues in the two proceedings are identical.

A workers' compensation claimant must establish, with clear and convincing evidence, that their condition "arose out of and in the course of employment" to be entitled to compensation. O.R.S. 656.803(3)(d). Plaintiffs' burden of proof on the claims presently before the court is a "preponderance of the evidence." Plaintiffs assert that these different burdens of proof prevent the two proceedings from being identical and bar the application of issue preclusion.

Plaintiffs have failed to offer a case in which the Oregon courts considered this issue. To the contrary, Plaintiffs have offered at least one case in which the Oregon Court of Appeals allowed an evidentiary finding in a workers' compensation hearing to bar the subsequent relitigation of that evidence in a state court proceeding. Stanich v. Precision Body and Paint, Inc., 151 Or.App. 446, 456 (1997)(court held that plaintiff was barred from relitigating whether she knew on a specific date that her job was in jeopardy based on ALJ's previous finding that she had such knowledge.) The court sees no reason to depart from the state court's apparent acceptance of the application of the doctrine of issue preclusion to factual findings underlying an ALJ's ultimate determination in a workers' compensation hearing despite the differing evidentiary standards.

-The issue was actually litigated and was essential to a final decision on the merits in the

prior proceeding.

Defendant contends that Plaintiffs are barred from relitigating virtually all of the facts set forth in the ALJ's decision. However, the Fisher test makes it clear that only issues essential to a final decision are subject to issue preclusion. The ALJ specifically found that the October 2002 discipline and the PPIs given to Scott through December 2002 were reasonable corrective actions and that the December 2002 layoff was based on ordinary business and financial cycles. The ALJ relied solely on these factual findings to conclude that Scott's mental disorder was not an occupational disease. The ALJ did not consider any conduct occurring after Scott was rehired in mid-January 2003 in reaching his decision. Accordingly, this post-January 2003 conduct has not been actually litigated in any prior proceeding and is subject to complete review by the court in this action.

Plaintiffs also argue that the ALJ's decision is currently on appeal and, therefore, is not a final decision on the merits. Recently, the Oregon Court of Appeals held that an appealable judgment is a final decision for issue preclusion purposes. Gruett v. Nesbitt, 172 Or.App. 113 (2001). Both this court and the Ninth Circuit have similarly held that "a final judgment may have res judicata effect, even during the pendency of an appeal." Nygaard v. United Parcel Service General Services, Co., 1 F. Supp.2d 1173, 1181 (D.Or. 1998)(citing Eichman v. Fotomat Corp., 759 F.2d 1434, 1439 (9th Cir. 1985). Although the ALJ's decision is on appeal, it is a "final decision" for issue preclusion purposes.

-The party sought to be precluded has had a full and fair opportunity to be heard on that issue.

Plaintiffs contend that they were not given a full and fair opportunity to be heard on the

merits at the workers' compensation hearing. Plaintiffs generally object to the different discovery and evidentiary rules applied to workers' compensation hearings as opposed to federal civil trials. The only specific complaint made by Plaintiffs is that they were unable to fully investigate new evidence discovered for the first time in depositions taken in this case. The new evidence revealed that Scott's former manager, Bill Capps, had accused Duley and Michael Schwartz[3] of discriminating against him after Capps advised them that he intended to enter the military.

In Stanich, the court rejected plaintiff's claim that a workers' compensation proceeding did not provide plaintiff with a full opportunity to contest the evidentiary findings of the ALJ subject to judicial review. The court held that plaintiff had failed to meet her "burden to bring to the court's attention circumstances indicating the absence of a full and fair opportunity to contest the issue in the first action." Id. at 455 (cites omitted). Here, Plaintiffs argue that they were not able to present evidence of prior discriminatory acts engaged in by Scott's supervisors against a co-worker in the workers' compensation proceeding. However, age discrimination was not at issue in the workers' compensation hearing and such evidence would have been irrelevant. The court questions whether such evidence is even relevant to Scott's current age and workers' compensation discrimination claims. Plaintiffs have failed to meet their burden to present evidence that they were not entitled to a full and fair opportunity to contest the issue of the compensability of Scott's mental disorder during the workers' compensation proceedings.

-The prior proceeding was the type of proceeding to which this court will give preclusive effect.

---

[3]It is unclear exactly what position Schwartz held but it is evident that he was in a managerial capacity over the automotive technicians and that manager of the Salem Automotive Center.

The Oregon courts have recognized that "some, but not all, types of administrative proceedings are appropriate to establish issue preclusion." Nelson, supra, at FN. 4 (citing State v. Ratliff, 304 Or. 254, 258 (1987)). The question of when an administrative decision has preclusive effect depends on:

> 1) whether the administrative forum maintains procedures that are "sufficiently formal and comprehensive";
>
> 2) whether the proceedings are "trustworthy";
>
> 3) whether the application of issue preclusion would "facilitate prompt, orderly and fair problem resolution"; and
>
> 4) whether the "same quality of proceedings and the opportunity to litigate is present in both proceedings."

Id.

The Oregon Supreme Court has held that "an administrative determination can be used as a basis for collateral estoppel in a later civil judicial proceeding." Chavez v. Boise Cascade Corp., 307 Or. 632, 634 (1989). In both Chavez and Stanich, the Oregon courts gave an ALJ's opinion in a workers' compensation proceeding preclusive effect.

Plaintiffs also argue that "to apply the doctrine of issue preclusion to the facts in the workers' compensation hearing is tantamount to denying Scott a jury trial of disputed facts to which he has a right under Article VII, section 3 of the Oregon Constitution" as well as his right to "due course of law in violation of Article I, section 10 of the Oregon Constitution." Plaintiffs' Opposition Brief at 11.

With regard to Plaintiffs' due course of law argument, this court has previously limited this argument to cases which challenge a legislative act. Prudential Property & Casualty Insurance Co., v. Lillard-Roberts, 2002 WL 31974401, *8 (D.Or. 2002). Plaintiffs are not challenging a legislative

act and are not entitled to assert a violation of Article I, Section 10 of the Oregon Constitution.

Plaintiffs' contention that they are entitled to a jury trial under the Oregon constitution is also not well-founded. Plaintiffs assert a right to a jury trial under Article VII, section 3, of the Oregon Constitution. As noted by Defendant, none of the claims asserted by Plaintiff in this action existed at the time the drafters wrote the Oregon constitution in 1857. Accordingly, Plaintiffs have no constitutional right to a jury trial on these claims. The United States Supreme Court reached a similar conclusion with regard to the Seventh Amendment right to a jury trial in Parklane Hosiery Company, Inc., v. Shore, 439 U.S. 322 (1979).

The court finds that the decision of an ALJ in a workers' compensation hearing is entitled to preclusive effect in a subsequent civil trial to the extent the issues are identical and were actually litigated in the workers' compensation hearing. In this case, the ALJ's determination that the October 2002 discipline, the December 2002 corrective actions and the layoff were valid, reasonable business actions is binding on this court. The ALJ did not specifically address Defendant's actions after Scott was rehired. Consequently, this evidence is subject to de novo review in this action.

**Scott's Motion for Summary Judgment**

Scott moves for summary judgment on all of his claims, which include age discrimination and retaliation under the state and federal acts, hostile work environment, wrongful discharge, workers' compensation retaliation and intentional infliction of emotional distress. The court will now consider each of these claims based exclusively on conduct that occurred after Scott was rehired in January 2003, as well as specific allegedly discriminatory statements made both before and after

January 2003.[4]

-Age Discrimination (ADEA and O.R.S. 659A.030(1)(a))

Scott alleges that Defendant discriminated against him based on his age in violation of both state and federal law. To survive summary judgment, Scott must first establish a *prima facie* case of discrimination. Scott's *prima facie* case of unlawful employment discrimination on the basis of his age may be established by either direct or circumstantial evidence.[5] "Direct evidence, in the context of an ADEA claim, is defined as 'evidence of conduct or statement by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude.'" Enlow v. Salem-Keizer Yellow Cab Co., Inc., 389 F.3d 802, 812 (9th Cir. 2004)(quoting Walton v. McDonnell Douglas Corp., 167 F.3d 423, 426 (8th Cir. 1999). Or, stated more succinctly, "direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1220 (9th Cir. 1998)(citing Davis v. Chevron, 14 F.3d 1082, 1085 (5th Cir. 1994)). Not every comment about a worker's age is direct evidence of a discriminatory motive. "The Ninth Circuit has held a 'stray remark' that is 'uttered in an ambivalent manner and [is] not tied directly to [the plaintiff]'s termination is insufficient to create an inference of discriminatory motive. Hartung v. Cae Newnes, Inc., 229

---

[4]The ALJ determined that Defendant's actions prior to January 2003 were based on valid, reasonable business practices. This determination, which is binding on this court, is contrary to Plaintiffs' allegations that Defendant's actions were based on discriminatory animus. Consequently, Defendant's pre-2003 conduct does not support any of Scott's claims and will not be considered by this court. The allegedly discriminatory statements were not relevant to the ALJ's decision and are, therefore, subject to consideration in this action.

[5]The standard for establishing a *prima facie* case of discrimination under Oregon law is identical to that used in federal law. Henderson v. Jantzen, Inc. 79 Or.App. 654 (1986).

F.Supp.2d 1093, 1100 (D.Or. 2002)(quoting Merrick v. Farmers Inc. Group, 892 F.2d 1434, 1438-39 (9th Cir 1990).

Absent direct evidence of a discriminatory motive, Scott may establish his *prima facie* case by showing that: (1) he is a member of the class protected by the statutes in question; (2) he was performing his job in a satisfactory manner; (3) he was denied some term, condition, or benefit of employment; and (4) similarly situated employees who are not members of the protected class were treated more favorably in this regard. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). In a claim alleging discharge on the basis of age, the fourth element is sometimes stated as requiring evidence that the plaintiff was "replaced by a substantially younger employee with equal or inferior qualifications." Nidds v. Schindler Elevator Corp., 113 F.3d 912, 917 (9th Cir. 1997).

If a plaintiff is able to establish a *prima facie* case of age discrimination, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision. The plaintiff must then demonstrate that the employer's alleged reason for the adverse employment decision is merely a pretext for an action that actually was motivated by the prohibited factor. Wallis v. J.R. Simplot, Co., 26 F.3d 885, 888 (9th Cir. 1994); Nidds, 113 F.3d at 916-18. When the prima facie case of age discrimination is based on circumstantial evidence, the plaintiff must present specific and substantial evidence that the defendant's proffered reasons were not defendant's actual reasons. However, if a plaintiff is able to establish his prima facie case with direct evidence, he is not required to produce additional evidence to rebut the reasons for the adverse employment action offered by the defendant. Enlow, supra, 389 F.3d at 812; Godwin, supra, 105 F.3d at 1221,1222.

Direct Evidence

Scott alleges that Desmond engaged in a campaign to get rid of him because he was older.

As evidence of Desmond's discriminatory motives, Scott has offered the following statements made by Desmond which Scott considers to be age-related:

1) In October 2002, Desmond asked Scott to look at something under the hood of a vehicle. Scott commented that he needed more light and Desmond responded "Why don't you just put on your old man glasses?"[6];

2) When Scott returned to work in January 2003, Scott thanked Desmond for calling him back to work, to which Desmond responded "Sears brought you back, and I don't make the same mistake twice.";

3) Desmond pulled Scott off an alignment and assigned the job to a younger employee. When Scott complaint that he needed the Tech III work to increase his paycheck and SPH, Desmond stated:

> "Well, why don't you just go ahead and let him do that. Since you're a senior technician here, it's easier for you to find more work while your doing your evaluations than it is for the younger ones because they really aren't - - they don't know really what they're looking for.";

4) Desmond described two instances in which Scott underperformed in a memo to Schwartz and stated "no wonder Salem auto center has such a low market penetration. People know that we have tolerated this sort of service for 29 YEARS!!!!!!!!!!!.";

5) Desmond commented to two service technicians that Scott "was not going to get any work, so he'll eventually quit.";

6) Desmond made reference to Scott being pretty well set in his retirement; and

7) Desmond stated that he would hate to see Scott just throw away 30 years with the

[6]Desmond was allegedly referring to the prescription glasses Scott wore under his safety goggles for close-up work.

company.

The statements that Scott was not going to get any work and would quit or that Desmond would not make the same mistake twice are in no way related to Scott's age. The statements relating to Scott's length of service with the company, while impliedly referring to Scott's age, do not directly implicate Scott's age and do not evidence Desmond's desire to get rid of Scott because of his age. The fact that Scott was a senior employee and had more experience and more money in his retirement account is not evidence of discrimination. Desmond's statement that he did not want to see Scott through away 30 years with the company supports Desmond's testimony that he was trying to work with Scott to overcome some of his deficiencies. The comment that Scott had underperformed for 29 years also supports Defendant's claim that Scott's service had been deficient to some degree since Scott was hired by Defendant. The only comment made by Desmond that was directly related to Scott's age was the comment about his "old man glasses." However, this comment in no way indicates that Desmond wanted to fire Scott because he was old and needed glasses.

Scott complained to Schwartz about Desmond's conduct. Schwartz allegedly told Scott that "people in your position should just quit." There is no evidence that Schwartz was referring to Scott's age and not his current performance problems when he made this statement.

Scott also presents evidence that his previous supervisor, Bruce Moore, told him that it was "out with the old and in with the new." Scott does not remember exactly when Moore said this but it was definitely after the announcement of the change in Defendant's policies and procedures intended to make Defendant more competitive and productive. While Scott asserts that the statement was made with regard to the age of Defendant's employees, he admits that:

> I never did ask him for a clarification on it, so, actually, in a sense like that, it very well could be our change from going from the old shop to the new shop because we

were getting rid of old stuff all of the time.

Scott Depo. at 117. This evidence shows that, while Moore's comment might have referred to the age of Defendant's employees, it could just as easily refer to the new policy and procedures adopted by Defendant at the time the comment was made.

Finally, Scott has offered evidence that Defendant discriminated against at least two other employees. Capps was told by Duley and Schwartz that he needed to chose between his job with Defendant and his desire to join the Navy reserves. Thereafter, Capps was allegedly subject to additional discipline and poor treatment by his supervisors. Additionally, Tavera witnessed "Desmond making Hispanic jokes on approximately five occasions." Tavera Aff. at 2. This evidence, at the most, proves that Defendant engaged in discrimination based on race and military service. It in no way supports Plaintiffs' claim that Scott was discriminated against because of his age.

Scott has failed to support his claim for age discrimination with direct evidence. The court will now consider the circumstantial evidence supporting his claim

Circumstantial Evidence

Scott asserts that when he returned from his lay off in January 2003, Desmond harassed him by assigning him lower paying jobs to reduce Scott's income and lower his SPH figures. In the summer of 2003, Scott was disciplined when two vehicles that he had worked on were returned with complaints about faulty, unsafe brake replacements. Scott contends that this discipline was not based on his performance, but rather on his age. Scott was terminated on October 13, 2003.

Job Assignments

In January 2003, Scott returned to work from what turned out to be a two-week layoff.

Shortly thereafter, Defendant hired Keith Hastings, Tech III, and Ryan Snook, Tech II, to work in the Salem Automotive Center. Both the new employees were less than 40 years old. Scott alleges that Desmond, and the customer service associates under Desmond's supervision, gave the better, higher paying work to Hastings and Snook resulting in a decrease of $100 per week in Scott's take-home pay as well as detrimentally affecting his SPH.

From the record, it is difficult to determine just how the technicians received their daily work assignments. Scott talks about Hastings and Snook taking work from the board and complaining that they would take the higher paying Tech III work and leave only Tech II or Tech I work for Scott. Scott also mentioned that Desmond assigned the work himself giving the preferential work to Hastings and Snook.

Desmond represented that when he assigned work, he delegated it in the manner he deemed most efficient. He admitted assigning Tech III work to Hastings and Snook instead of Scott but explained that it was because Hastings and Snook were more capable of completing tasks in a timely manner. He also explained that because Hastings and Snook completed jobs more quickly, they were able to take on more work and were assigned the work that needed to be completed in a timely manner. Scott presented testimony of coworkers to establish that his work was of high quality and that he did it in a reasonable amount of time.

Scott complained to Desmond, Schwartz and Pete Cordinelli, regional manager, about the alleged inequities in work assignments. Desmond altered the assignment method to address Scott's concerns and gave the sales associates the responsibility for assigning work to the technicians.

Performance Reviews

Scott complains that he received poor performance ratings from Desmond in reviews

performed in March and June of 2003. These reviews are not a part of the record. However, the record does include an August 5, 2003, PPI in which Desmond documented a number of performance issues with regard to Scott. Desmond pointed out that Scott's SPH was $23.38, well below the expected $38. Desmond attributed the poor showing to Scott's inability to service a vehicle in a timely manner, often taking twice as long as another Tech III on a similar job. Desmond also noted that Scott was not writing clear, clean, neat informative comments that followed Defendant's guidelines. Desmond advised Scott that "failure to correct this deficit in productivity will result in follow up PPI's and could lead to disciplinary action up to and including termination (if not corrected.)" Desmond Aff., Exh. A. at 2.

The follow-up PPI indicated that Scott's year to date SPH was $23.54 and that Scott had shown minimal improvement on the issues addressed in the August PPI. Scott's lack of performance, and his inappropriate comments and antagonistic attitude toward team members and management were seen to detrimentally affect team moral. Desmond indicated that he expected Scott to increase his SPH to $38, improve his communication skills, increase his productivity, accept coaching and training and build relationships with his co-workers by October 10, 2003, or be subject to disciplinary action, including termination.

Deficient Brake Jobs

On April 6, 2003, Desmond sent a memorandum to all Tech III's informing them of the Salem Automotive Center's high percentage of warranty brake repairs and expressed a desire to improve this number. To decrease the number of customers returning with complaints about brake work, Desmond required all Tech III's to:

> make sure we are following company policy and procedure on these jobs. Areas of concern are test drives performed before and after to verify customer complaints and

> resolution, use of the On Car brake lathe, and washing of all rotors (not with Brake Clean) with soap and water.

Duley Depo., Exh. 14.

On June 10, 2003, Scott determined that a Honda Accord he was working on had deficient brakes. Scott performed extensive brake repairs to remedy the problem, including replacing the rear brake drums, the rear brake shoes, the front brake calipers and pad, the right outer front CV boot, the left front CV shaft and front strut-rod bushings. Two days later, the Accord owner returned complaining that the brake pedal was low. Scott and a customer service representative test drove the car and inspected the brakes but were unable to find anything wrong. However, based on the customer's complaints, Scott replaced the parts and re-bled the brakes. In late June, 2003, the Accord owner returned again reporting that the car had lost its brakes going downhill and the driver had to jump from the car to avoid injury.

> The Accord was inspected by Hastings, who discovered, among other things, that:
>
> (a) the rear brake cylinders and master cylinder were not functioning properly which caused the brakes to be over worked trying to stop the vehicle; (b) that the strut rod bushings were not installed correctly, allowing the right front wheel to move forward and back over one inch; (c) that both axle nuts had been over torqued which may have damaged the bearings; and (d) that the alignment was out and from what I could tell had not been adjusted in the rear.

Hastings Aff. at 2. The Honda was repaired at an expense of $3,000 to Defendant.

Scott felt that the brake malfunction was the result of operator misuse and that the driver had not allowed sufficient cooling time between brake applications. He felt that the customer service representative was at fault for not explaining to the customer the need to allow the brakes to cure before engaging in any unusual or extreme braking.

Based on Hastings inspection and report, Desmond restricted Scott from performing brake

repairs until after he attended brake school, which Scott completed in mid-August. He also required Scott to take a drug and alcohol test shortly after he returned from his vacation pursuant to Defendant's policy requiring a substance test whenever a recall cost exceeded $500. The test results were negative.

On September 10, 2003, Scott inspected a Suburban with a violent front end shudder. A Tech I had installed four new shock absorbers on the vehicle in June 2003 and a Tech III performed a front-end alignment in late August 2003. Scott found that the lower ball joints and the front-end stabilizer were deficient and recommended the installation of a front-end shock and two lower ball joints. Scott also recommended another front-end alignment, finding that the previous alignment was premature in light of the other front-end troubles. In addition to the front-end work, Scott performed a front "Ultimate Brake Job" at the request of the customer. Despite all of this work, Scott was still not satisfied with the result and recommended that the power assist system be serviced to ensure the ability to stop in emergency situations. The customer declined the power assist service.

Later that month, the customer returned complaining of a low brake pedal and diminished stopping ability. Hastings inspected the Suburban and determined that Scott had failed to clean, adjust and service the rear brakes, which was a mandatory service included in a front Ultimate Brake Job. As a result, the brake system had been damaged and the master cylinder was leaking. When questioned by Desmond, Scott acknowledged that a front Ultimate Brake Job requires the cleaning and adjusting of the back brakes and admitted that he had not removed the rear tires to complete this work. He explained that he felt that it was not necessary because the Tech III had inspected the brakes during the initial evaluation and should have cleaned and adjusted the rear brakes at that time.

On October 10, 2003, Desmond recommended to Duley that Scott be terminated. Desmond based this recommendation on Scott's: 1) admitted failure to clean and repair the Suburban's back brakes as required in an Ultimate Brake Job, and 2) recent history of substandard brake work. Duley terminated Scott on October 13, 2003, based primarily on his failure to complete all of the elements of a brake job that a customer requested and paid for. This action was supported by both Pam Fowler, of Defendant's Human Resources Department, and Randy Blackburn, Defendant's District General Manager.

In its motion for summary judgment, Defendant asserts that Scott is unable to prove a *prima facie* case with circumstantial evidence because Defendant did not hire someone to replace Scott after he was terminated. The cases establish that replacing an employee with a younger employee is evidence of age discrimination. However, this is not the only way to support a circumstantial case of age discrimination. A terminated employee need only show that the "discharge occurred under circumstances giving rise to an inference of age discrimination." Coleman v. Quaker Oats Co., 232 F.3d 1271, 1281 (9th Cir. 2000)(citing Rose v. Wells Fargo & Co., 902 F.3d 1417, 1421 (9th Cir. 1990)). This inference "can be established by showing that the employer had a continuing need for his skills and services in that his various duties were still being performed," Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994), or by showing "that others not in his protected class were treated more favorably." Washington v. Garrett, 10 F.3d 1421, 1434 (9th Cir. 1994).

Scott concedes that Defendant did not hire a younger employee to replace him. The question then is whether Scott has proven that Defendant had a continuing need for his skill and services or that younger employees were treated more favorably.

Scott was employed as a Tech III at the time of his termination. One of his complaints was

that the majority of the Tech III work was performed by Hastings and Snook and that he was spending most of his time on Tech I or Tech II work. It appears that Hastings and Snook, who continue to work for Defendant, have continued to perform the Tech III work, which establishes that Defendant does not have a continuing need for another employee with Tech III qualifications.

Scott argues that the "Auto Center has experienced a substantial increase in business since Scott's termination" and that "Defendant appears to be overworking their current auto technicians to disguise an obvious need for additional Tech III help." Plaintiffs' Opposition Brief at 9. The record is completely void of any evidence to support these statements. Defendant has retained the same employees in the same positions doing the same work and has not altered its staff in any way since Scott's termination. Plaintiff is unable to prove that Defendant had a continuing need for Scott's skills and services as a Tech III technician.

Other than the fact that Scott was the oldest employee and he was terminated, Scott has also failed to present evidence that the younger employees were treated more favorably than him. There is no evidence that the younger employees were having the same problems as Scott with recalled brake jobs or meeting their SPH requirements. Based on the evidence currently before the court, Scott has failed to establish a *prima facie* case for age discrimination.

Even assuming that Scott is able to meet this burden, he is unable to establish that Defendant's proffered reason for terminating him was pretext. Scott was terminated for failing to complete all elements of a brake job requested and paid for by a customer, as well as a history of substandard work on other brake jobs. In April 2003, Desmond advised all Tech III's that they needed to improve their performance on brake jobs. On at least two occasions after this discussion, customers returned complaining of brake jobs performed by Scott. Scott offered alternative reasons

for the failing of his brake jobs but he also admitted to not performing services he knew he was expected to perform on at least one of the recalled brake jobs. Based on Defendant's stated concern about high brake job recalls and Scott's admitted failure to follow brake-job protocol, Defendant's reasons for terminating Scott were justified and supported by the record and not pretextual. Defendant is entitled to summary judgment on Scott's claims for age discrimination under both state and federal law.

-Retaliation (ADEA and O.R.S. 659A.030(1)(f))

A similar burden shifting analysis governs Scott's retaliation claim. Nidds, 113 F.3d at 919. A *prima facie* case requires Scott to show that: (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) there is a causal link between the protected activity and the employer's action. Id. Under Ninth Circuit law, "[c]ausation sufficient to establish a *prima facie* case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge." Miller v. Fairchild Indus., Inc., 797 F.2d 727, 731 (9th Cir. 1986).

In his statement of facts, Scott asserts that he complained to:

1) Cordinelli about Desmond's treatment of Scott. Scott does not indicate when this complaint was made or what Mr. Cordinelli's response was.

2) Schwartz about the work assignments in spring of 2003 and Schwartz allegedly responded that "people in your position should just quit." Desmond altered the work assignment method to address Scott's concerns in July 2003.

3) Duley about the work assignments in spring of 2003 and Duely allegedly responded that Desmond was Scott's "reality". Again, the record shows that Desmond altered the work assignment

method to address Scott's concerns in July 2003.

4) higher management in general and that after each complaint, he was further disciplined by Desmond. However, there is no evidence in the record of any complaints to higher management about Desmond other than those listed above.

5) Desmond about the constant harassment he was receiving. Desmond advised Scott that he needed to work on his communication skills.

With the exception of Scott's complaint to Schwartz about work assignments in spring of 2003, there is no evidence in the record about when these complaints were made. Defendant responded to this complaint in July 2003 by changing the method of assigning work. Scott was not terminated until October 2003. There is no evidence of a causal link between Scott's complaints about work assignments and his termination. Scott has failed to adequately support his claim for retaliation and Defendant is entitled to summary judgment on these claims.

-Hostile Environment (O.R.S. 659A.030(1)(b))

Under Oregon law, an employer has engaged in an unlawful employment practice if it discriminates against any individual in compensation or in terms, conditions or privileges of employment based upon that individual's race, religion, color, sex, national origin, marital status or age. O.R.S. 659A.030(1)(b). Generally, hostile environment claims are predicated on harassment that creates an abusive or hostile working environment for minority members. Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986).

Scott's claim against Defendant for violation of O.R.S. 659A.030(1)(b) is based on a hostile working environment. In order to support such a claim, Scott must establish that the discrimination practiced in the Salem Automotive Center was so severe and pervasive that it altered the conditions

of his employment and created an abusive working environment. Id. at 67. This court has held that isolated comments or sporadic incidents of harassment are insufficient to create a hostile working environment. Benitez v. Portland General Elec., 799 F.Supp. 1075, 1080 (D.Or. 1992).[7]

Scott contends that Desmond made his life miserable from the time Desmond came to work in the Salem Automotive Center. Desmond allegedly coached and disciplined Scott on a regular basis, failed to give Scott Tech III assignments, and required Scott to go back to brake training.

In this opinion, the court is considering only that harassment engaged in after January 2003. However, the court finds that the ALJ's determination that Desmond's treatment of Scott prior to his return in January 2003 was reasonable and justified is informative and relevant to the relationship between Desmond and Scott in 2003. With the exception of the inequitable work assignments and the return to brake school, virtually everything Scott complains about in 2003 occurred in 2002 as well. The ALJ listened to the testimony of several witnesses, reviewed numerous documents and determined that this conduct was properly characterized as reasonable discipline and corrective actions. Scott has presented no evidence that Desmond's alleged harassment increased either in severity or quantity after 2002 and, accordingly, has failed to establish that the 2003 conduct was anything other than reasonable discipline. The work assignment complaints were remedied in July 2003 and requiring Scott to return to brake school was justified in light of the deficient brake jobs performed by Scott. Furthermore, Scott has presented no evidence that the harassment suffered by

---

[7]As noted above, case law developed by the federal courts in the interpretation of Title VII of the Civil Rights Act of 1964 can be used to interpret Chapter 659 (renumbered to O.R.S. 659A in 2001) of the Oregon Revised Statutes because the statutory schemes are similar and Chapter 659 of the Oregon Revised Statutes is patterned after Title VII. Vaughn v. Pacific N.W. Bell Tel. Co., 289 Or. 73, 91, 611 P.2d 281 (1980).

Scott was linked in any way to Scott's age. Defendant is entitled to summary judgment on Scott's hostile environment claim.

-Wrongful Discharge

Generally, an employer may fire an at-will employee at any time and for any reason, unless doing so violates a contractual, statutory or constitutional requirement. Patton v. J.C. Penney Co., 301 Or. 117, 120 (1986). Oregon law recongizes two narrow exceptions to this rule. The first is when an employee is discharged for exercising a job-related right of important interest. The second is when the plaintiff is discharged for complying with a public duty. Draper v. Astoria School Dist. No. 1C, 995 F.Supp. 1122, 1127 (D.Or. 1998)(citations omitted). Resisting unlawful discrimination is an employment related right that may serve as the basis for a wrongful discharge claim. Holien v. Sears, Roebuck & Co., 298 Or. 76, 90 (1984). "As with a retaliation claim, a plaintiff is required to show a causal connection between the exercise of the employment-related right (opposing the discrimination) and the adverse employment action (the discharge)." Pasco v. Mentor Graphics Corp., 199 F.Supp.2d 1034 (2001).

The court has already determined that Scott has failed to establish a causal relationship between Scott's complaints about Desmond's behavior and his termination. This finding is relevant to Scott's wrongful discharge claim as well. As Scott is unable to prove that his complaints about Desmond's behavior were the cause of his termination, Defendant is entitled to summary judgment on Scott's wrongful termination claim.

-Workers' Compensation Retaliation (O.R.S. 659A.040)

The parties agree that the test set forth in Hardie v. Legacy Health System, 167 Or.App. 425 (2004) controls Plaintiffs' claim for workers' compensation retaliation. Hardie requires a plaintiff

to show: (1) that he invoked the workers' compensation system after he was injured; (2) that he was discriminated against in tenure, terms or conditions of employment; and (3) that the defendant-employer discriminated against him because he invoked the workers compensation system. Id. at 433. The burden shifting analysis of McDonnell Douglas applies to all claims brought under O.R.S. 659A. Snead v. Metropolitan Property & Casualty Insurance, 237 F.3d 1080, 1090-94 (9th Cir. 2001).

Scott requested a workers' compensation claim form on September 24, 2003, filed the Claim on October 1, 2003, and was terminated on October 13, 2003. Unlike his retaliation claims, Scott has provided the date he filed the Claim and has established, based on timing alone, a genuine issue of material fact on the causal relationship between the filing of the Claim and Scott's termination. However, the court's determination that Defendant's proffered reason for Scott's termination is reasonable and not based on pretext applies to this claim as well. Scott is unable to meet his burden of showing that the reasons for Scott's termination are pretextual and Defendant is entitled to summary judgment on Scott's claim for workers' compensation retaliation.

-Intentional Infliction of Emotional Distress

Under Oregon law, a claim for intentional infliction of emotional distress only lies where the defendant intended to inflict severe emotional distress on the plaintiff, the defendant's acts were the cause of severe emotional distress, and the defendant's acts were an "extraordinary transgression of the bounds of socially tolerable conduct." Madani v. Kendall Ford, Inc., 312 Or. 198, 203 (1991). It is the defendants' acts, rather than their motives, that must be outrageous. Id. at 204.

The Oregon courts have limited the term intent to include only those situations where the defendant "'desires to inflict severe emotional distress, and also where he knows that such distress

is certain, or substantially certain, to result from his conduct.'" McGanty v. Staudenraus, 321 Or. 532, 550 (1995)(quoting Restatement (Second) of Torts, § 46, comment I (1965)). The conduct must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Christofferson v. Church of Scientology, 57 Or. App. 203, 211 (1982) (quoting Restatement (Second) on Torts, § 46, comment d (1965)).

The ALJ found that Desmond's alleged harassment of Scott in 2002 was reasonable and based on valid business procedures. The conduct occurring in 2003 was more of the same, without an increase in the severity or quantity of the conduct or the quantity. While Scott may have been upset by the coaching, discipline and treatment he received from Desmond in 2003, he has failed to establish that any of this treatment exceeded that engaged in everyday in businesses across the state. Needless to say, he has failed to establish that Desmond's conduct exceeded all possible bounds of decency. Scott claim for intentional infliction of emotional distress is not support by the record and Defendant is entitled to summary judgment.

-Loss of Consortium

Cathie Scott asserts a claim for loss of consortium based on the emotional distress suffered by Scott as a result of Desmond's conduct. Plaintiffs agree that this claim is derivative of Scott's

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

claim for intentional infliction of emotional distress. The court's ruling on Scott's claim for intentional infliction of emotional distress bars Cathie Scott's claim for loss of consortium.

## Conclusion

Defendant's motion (#37) is GRANTED with regard to conduct that occurred prior to Scott's return in January 2003 and DENIED in all other respects. Defendant's motions (#18 and #22) for summary judgment are GRANTED.

DATED this 17th day of October, 2005.

/s/ Donald C. Ashmanskas
DONALD C. ASHMANSKAS
United States Magistrate Judge